IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-327

Filed 18 March 2026

Harnett County, No. 23JT001035-420

IN RE:

L.D.W.

A Minor Juvenile.

Appeal by respondent-appellant father from order entered 6 January 2025 by Judge Jason H. Coats in Harnett County District Court. Heard in the Court of Appeals 29 October 2025.

> *Reeves Divenere & Wright, by Anne C. Wright, for respondent-appellant father.*
>
> *Jonathan McGirt for petitioner-appellee mother.*
>
> *Jones & Jones, PLLC, by Cecil Bo Jones, for appellee-Guardian ad Litem. no brief filed.*

GORE, Judge.

Respondent-father appeals the order terminating his parental rights to Lucas.[1] Respondent-father challenges the bases for adjudication and the exclusion of certain evidence during the termination hearing. Upon reviewing the record and the briefs, we affirm.

**I.**

---

[1] A pseudonym used to protect the identity of the juvenile.

Respondent-father and petitioner-mother are the biological parents of Lucas, who was born in 2018. Respondent-father, petitioner-mother, and Lucas lived together until petitioner-mother moved out with Lucas in June 2019. Petitioner-mother moved out because respondent-father was abusing drugs and alcohol and having violent outbursts. He punched holes in the walls, kicked in a door, shot at petitioner-mother's dog, and shot at petitioner-mother. Petitioner-mother filed a complaint for child custody and obtained a consent custody order that limited respondent-father's visitation with Lucas to every other weekend for eight hours, four hours Saturday and four hours Sunday, at the paternal grandmother's house. The order required the paternal grandmother to supervise visitations. After sporadic visits throughout 2019 and into 2021, petitioner-mother sought a modification to the custody order when respondent-father was found driving unsupervised with Lucas during a visitation.

Petitioner-mother sought and obtained a domestic violence protective order ("DVPO") due to ongoing harassment and threats from respondent-father. The DVPO prohibited respondent-father from contacting petitioner-mother, other than through attorneys. On 27 July 2021, the district court entered a temporary custody order that ceased respondent-father's visitations with Lucas and limited his contact to a phone call with Lucas on Mondays, Wednesdays, and Fridays at 7:00 p.m. Respondent-father called Lucas, by calling petitioner-mother, in August 2021 and on 15 September 2021 during the court ordered call times. Respondent-father continued to

call and harass petitioner-mother outside the set times established in the temporary custody order. As a result, he was convicted of violating the DVPO and served a short jail sentence. He violated the DVPO again in August 2022 and served another short jail sentence.

Respondent-father did not call Lucas after 15 September 2021 until 2024. In December 2022, petitioner-mother filed a motion for permanent custody. A notice of the hearing date for the motion was sent to respondent-father's address in Dunn, North Carolina, the same address of which previous orders and notices were sent. Respondent-father was not present at the hearing on 9 January 2023, and the trial court granted a permanent custody order awarding sole legal and physical custody to petitioner-mother. The permanent order specified respondent-father should have no contact with Lucas "directly or indirectly." A copy of the permanent order was sent to the same address in Dunn, North Carolina.

On 2 March 2023, petitioner-mother filed a petition for termination of respondent-father's parental rights to Lucas. Respondent-father filed a motion to dismiss the petition, and later on 23 September 2023, he moved for relief pursuant to Rule 60 to set aside the permanent custody order. The trial court set aside the permanent custody order on 22 May 2024, citing a lack of notice of the hearing date. In the six months leading up to the filing of the petition, respondent-father did not have any contact with Lucas, he did not provide any child support, and he did not send any gifts, letters, or cards. Respondent-father did not seek to modify the terms

of the custody orders in place prior to his motion to set aside the permanent custody order (which was filed after the six-month window of time). After the termination hearing in December 2024, the trial court entered an order terminating respondent-father's parental rights after finding grounds existed to terminate his parental rights pursuant to sections 7B-1111(a)(1) and (a)(7); and after concluding it was in the best interests of the juvenile. Respondent-father timely appealed the order.

## II.

Respondent-father appeals of right pursuant to N.C.G.S. §§ 7A-27 and 7B-1001(a)(7). Respondent-father seeks review of the following: (1) whether the trial court erred by determining grounds existed to terminate his parental rights on the basis of willful abandonment pursuant to N.C.G.S. § 7B-1111(a)(7); (2) whether the trial court erred by determining grounds existed to terminate his parental rights on the basis of neglect pursuant to N.C.G.S. § 7B-1111(a)(1); and (3) whether the trial court erred by denying the admission of certain material evidence during the termination hearing.

## A.

Respondent-father argues the trial court's determination he willfully abandoned Lucas pursuant to section 7B-1111(a)(7) was unsupported by the findings during the relevant six-month period. "We review a trial court's adjudication to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law. The trial court's conclusions

of law are reviewable de novo on appeal." *In re Z.A.M.*, 374 N.C. 88, 94 (2020) (cleaned up). "Unchallenged findings are deemed supported by competent evidence and are binding on appeal." *In re K.Q.*, 381 N.C. 137, 141 (2022) (cleaned up). "Moreover, we review only those challenged findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." *In re L.M.M.*, 379 N.C. 431, 434 (2021) (cleaned up). Further, a general challenge to multiple findings of fact is considered "broadside and ineffective." *In re K.D.*, 178 N.C. App. 322, 327 (2006).

Under section 7B-1111(a)(7), the trial court may terminate parental rights when the parent "willfully abandon[s] the juvenile for at least six consecutive months immediately preceding the filing of the petition or motion." *In re K.C.T.*, 375 N.C. 592, 600–01 (2020). The trial court looks at this narrow window of time and may only consider evidence outside that time frame to "evaluate the parent's credibility and intentions." *Id.* at 601. "Abandonment implies conduct . . . which manifests a willful determination to forego all parental duties and relinquish all parental claims to the child." *In re C.B.C.*, 373 N.C. 16, 19 (2019). "If a parent withholds that parent's presence, love, care, the opportunity to display filial affection, and willfully neglects to lend support and maintenance, such parent relinquishes all parental claims and abandons the child." *Id.* (cleaned up). Willful intent "is a question of fact to be determined from the evidence." *In re B.C.B.*, 374 N.C. 32, 35 (2020).

Respondent-father concedes he had no contact with Lucas during the six-month period, 2 September 2022 through 2 March 2023. Respondent-father argues the orders in place during the six-month period and his incarceration (from 5 September 2022 through 4 November 2022 and 18 November 2022 through 9 December 2022) prevented him from having any contact. Additionally, he points to a permanent custody order entered 13 January 2023, that was set aside 29 September 2023 for lack of adequate notice, as further evidence he did not willfully abandon Lucas. The trial court made the following unchallenged findings related to willful abandonment:

> 21. The July 27, 2021 Custody Order vested the Petitioner with sole legal and physical custody of the Juvenile. This Order also mandated that the Respondent was to have no physical contact with the Juvenile, but did allow the Respondent to call the Juvenile at 7:00 p.m. on Monday, Wednesday, and Friday each week. In addition, the July 27, 2021 Custody Order required the Respondent to submit to a hair follicle drug test within 14 days and submit to a full psychological evaluation to determine what, if any, mental health needs and diagnosis he may have had at that time. The parties were to share equally the cost of the psychological evaluation. The July 27, 2021 Custody Order also indicated that either the Petitioner or Respondent could request a review of custody after 90 days or after the Respondent had completed his drug testing and psychological evaluations ordered by the Court.
>
> 22. At no time has the Respondent ever obtained a hair follicle drug test in order to advance his custodial rights to the Juvenile or as ordered by the Court in the July 27, 2021 Custody Order.
>
> 23. At no time has the Respondent ever obtained a

psychological evaluation in order to advance his custodial rights to the Juvenile or as ordered by the Court in the July 27, 2021 Custody Order.

. . .

25. Prior to the entry of the July 27, 2021 Custody Order, the Petitioner filed for a Domestic Violence Protective Order. The Petitioner filed for *ex parte* relief in the domestic violence action on June 14, 2021 and obtained an *Ex Parte* Domestic Violence Protective Order on June 14, 2021, which prohibited the Respondent from contacting the Petitioner and threatening members of the Petitioner's family or household, and required that he not go within 50 yards of the Petitioner and stay away from any place where the Petitioner received shelter. The Domestic Violence Protective Order was entered in Harnett County File Number 21 CVD 1262. A return hearing was held on June 21, 2021. At the return hearing, a Domestic Violence Protective Order was entered for a period of one year.

26. Due to ongoing harassment and violations of the Domestic Violence Protective Order, the Petitioner sought to renew the Domestic Violence Protective Order by filing a motion on June 10, 2022, which was granted and provided that the Domestic Violence Protective Order would remain in effect through June 2024.

. . .

28. After the July 27, 2021 Custody Order was entered allowing the Respondent to call the Juvenile, the Respondent called and spoke with the Juvenile four times. Specifically, the Respondent called on August 11, 2021, August 16, 2021, August 23, 2021, and September 15, 2021.

. . .

30. The Respondent called the Petitioner's phone outside of the days and times (Monday, Wednesday, and Friday at 7:00 p.m.) set out in the July 27, 2021 Custody Order. The calls were made during the middle of weekdays when the

Juvenile was not with the Petitioner, late at night when the Juvenile was asleep, and were made to harass the Petitioner rather than to speak with the Juvenile. This behavior led to the Respondent's first charge and conviction of violation of the Domestic Violence Protective Order wherein the Respondent was placed on probation in Harnett County File Number 21 CR 052535. The Respondent had a second conviction of violation of the Domestic Violence Protective Order arising from his harassment of the Petitioner on August 5, 2022. This is set forth in Harnett County File Number 22 CR 261325. Nevertheless, the Respondent remained able under the July 27, 2021 Custody Order to call the Juvenile at 7:00 p.m. on Monday, Wednesday, and Friday.

32. Prior to filing a Petition for Termination of Parental Rights in this action, the Respondent did not call the Juvenile again after September 15, 2021. The Respondent did call the Petitioner's phone twice two weeks prior to the Termination of Parental Rights trial, those calls being November 18 and November 20, 2024. The Respondent did not speak to the Juvenile, and has not spoken to the Juvenile since September 15, 2021, when the Juvenile was three years old.

33. The Petitioner's phone number has not changed since the time of the Juvenile's birth and the Petitioner has remained a resident of Harnett County throughout the Juvenile's lifetime. At least until November 2022 when the Petitioner and her current husband began living together, the Respondent knew where the Petitioner lived as he had been to her home on various occasions. The Petitioner's work and office as a realtor has been in the Lillington area of Harnett County since 2019.

. . .

36. The Respondent has not seen or been in the physical presence of the Juvenile since May 29, 2021.

. . .

39. The Respondent has sent no cards, letters, or gifts to the Juvenile since 2021.

42. The Respondent has made no inquiry with the Juvenile's educators or healthcare providers concerning the Juvenile.

43. The Respondent has provided no financial support to the Juvenile since 2021 by payment of money or provision of necessities. The only support that was offered from the Respondent occurred in July 2023 after the Respondent was served with the Petition for Termination of Parental Rights. . . . The Petitioner produced income information in discovery and the Respondent still did not provide support thereafter.

44. After the July 27, 2021 Custody Order was entered, the Respondent on at least one occasion told the Petitioner he wanted to terminate his parental rights and told the Petitioner to have the "papers drawn up" to accomplish this.

47. The Respondent has willfully failed to demonstrate love, affection, or responsibility as a parent towards the Juvenile since 2021.

Our review of the unchallenged and binding findings of fact demonstrate respondent-father still had the ability to communicate with Lucas within the specified time frame of Mondays, Wednesdays, and Fridays at 7 p.m. during the six-month period leading up to the filing of the petition. Further, the temporary custody order provided respondent-father with an opportunity to seek review of the custody order once respondent-father submitted to drug and psychological testing.

The unchallenged findings also contradict respondent-father's claim that when he attempted to contact Lucas he violated the terms of the DVPO. Namely, it specifies

that he called outside of the days and times set out in the temporary custody order and this triggered the violations and convictions of the DVPO. Even if we were to believe respondent-father's argument that the Permanent Custody Order filed in January 2023 prevented him from making any contact, this would not cure the lack of contact between September 2022 and January 2023. We are unpersuaded by respondent-father's excuse that the limited jail time he incurred because of his violations of probation and the DVPO prevented him from making any effort to contact Lucas. "Incarceration, standing alone, is neither a sword nor a shield in a termination of parental rights decision." *In re C.B.C.*, 373 N.C. at 19 (cleaned up). "Despite incarceration, a parent failing to have any contact can be found to have willfully abandoned the child." *In re D.J.D.*, 171 N.C. App. 230, 241 (2005) (cleaned up). Although respondent-father argues the trial court did not make any findings of what limited ability he had to contact Lucas while incarcerated, respondent-father provides us with no evidence of any acts he did take to contact Lucas.

Finally, respondent-father's argument that the trial court's FOF 35 is unsupported by the evidence is unavailing. FOF 35 states:

> 35. The 2023 Permanent Custody Order was also sent to the same address the Respondent claimed not to reside at in his Rule 60 Motion indicating then that he did not receive the Order either. Hence, the Respondent should have been under the belief that he could continue to call the Juvenile by the terms of the July 27, 2021 Custody Order and despite this he failed to do so. Moreover, when the Rule 60 Motion was granted on September 29, 2023 setting aside the January 2023

> Permanent Custody Order, the Respondent still did not attempt to call the Juvenile per the terms of the July 27, 2021 Custody Order until November 2024 when he made two calls to the Petitioner's phone just two weeks prior to the trial in this action.

Respondent-father argues this is a speculative FOF that should be disregarded because he only lacked notice of the hearing and not the entered permanent custody order. But a review of his motion to have the permanent custody order set aside contradicts this claim. According to his motion, he had moved from the address where the notice of the hearing was sent, and according to the affidavit of the paralegal who sent these notices, the permanent custody order was also sent to the same address of which he no longer resided. As a result, FOF 35 is supported by clear, cogent and convincing evidence.

The unchallenged findings along with FOF 35 support the trial court's conclusion that respondent-father willfully abandoned Lucas during the six-month period preceding the filing of the petition for termination of his parental rights. Respondent-father's arguments about why he lacked contact with Lucas during the six-month period are contradicted by the record evidence and further serve to support the trial court's conclusion he willfully abandoned Lucas. Conclusion of the existence of one ground for termination pursuant to section 7B-1111(a)(7) supports termination of respondent's parental rights. *In re C.B.C.*, 373 N.C. at 23. Accordingly, we do not consider respondent-father's additional arguments challenging the other grounds for termination.

**B.**

Next, respondent-father argues the trial court erred by preventing him from presenting evidence material to his case. Specifically, respondent-father argues the trial court prevented him from cross-examining petitioner-mother about her motives to demonstrate it was the hostile relationship between the parties that led to the inconsistent visitations rather than willful intent. A review of the transcript with respondent-father's explanation upon objection does not evoke the same argument. Respondent-father's attorney stated the following to explain his line of reasoning:

> MR. DUKE: Your Honor, this is not an attempt to go impermissibly into the second stage of this trial. It is, rather, again, the credibility and the motive of the witness, who has been the sole source of investigation at this point as to what has transpired and how it's transpired. It's been characterized. We've gone into depth about who she's married to, how she met him. He's called Dad. To be precluded from going into what the motives may be for these omissions, for these filings, where the direction of travel is for this witness and what she's trying to accomplish throughout these proceedings, I believe that would impermissibly reduce the scope of the cross-examination to be effective.
>
> MS. WILLIAMS: Still goes to best interests, Your Honor. At the end of the day, that's where we are.
>
> THE COURT: I agree. Well, let's hold off until we get to the best interests to talk about this.

Respondent-father refers to *In re E.B.* to support the importance of allowing evidence that shows the hostility between petitioner-mother and respondent-father, because in *In re E.B.*, the Court considered similar evidence to be a relevant

alternative reason for the lack of visitation and to disprove willful abandonment. 375 N.C. 310, 320 (2020). Beyond this, respondent-father argues the limitation on cross-examination was prejudicial to him because any evidence allowed during the disposition stage is not available to support the adjudicatory phase of the hearing. Because of this, respondent-father argues he was "foreclosed from presenting evidence on willfulness."

There is no evidence in the record of what respondent-father intended to ask petitioner-mother apart from the few questions asked. We are limited in our review to only what is in the record, not what was intended or was speculative. *See In re C.D.H.*, 265 N.C. App. 609, 612–13 (2019); N.C.R. App. P. 9(a)(1)(j). The record transcript is limited to respondent-father's initial questions prior to the objection:

> MR. DUKE: Throughout the course of this court proceeding, [petitioner-mother], you have separated yourself not just from [respondent-father] but his entire family; is that accurate?
>
> PETITIONER-MOTHER: I wouldn't – I mean, I have not had contact with his family.
>
> MR. DUKE: Fair to say that [Lucas] had a positive relationship with his grandmother?
>
> PETITIONER-MOTHER: He had a relationship early on with her, yes.
>
> MR. DUKE: And that also included the extended family, right? There were cousins that he would play with?
>
> MS. WILLIAMS: Objection, Your Honor. I think at this point it goes to best interests and whether or not there are grounds to terminate [respondent-father's] rights. If we're

> going to get into that, I need to go back and ask her questions on redirect about the relationship with [Lucas].

Respondent-father did not suggest to the trial court that he attempted to elicit an alternative reason for the lack of contact or to demonstrate an alternative to willful abandonment of Lucas. The present case differs from *In re E.B.* both factually and legally. Additionally, we do not discern any prejudice as a result of the trial court's limitation on cross-examination. There is plenty of evidence in the record showing the hostility between respondent-father and petitioner-mother through text messages, judicially noticed court files, and witness testimony. To the extent respondent-father argues the trial court abused its discretion by limiting his cross-examination during the adjudicatory phase, we discern no error.

## III.

For the foregoing reasons, the trial court properly determined there were grounds to terminate respondent-father's parental rights pursuant to section 7B-1111(a)(7). Additionally, the trial court did not abuse its discretion by limiting respondent-father's cross-examination of petitioner-mother during the adjudicatory phase.

AFFIRMED.

Judges ARROWOOD and GRIFFIN concur.